Argued and submitted May 11, affirmed November 25, 1998

# FARMERS INSURANCE COMPANY OF OREGON,
*Respondent,*

*v.*

## Randie Pomelow JESKE,
individually and as guardian ad litem
for Chad Pomelow, a minor;
Chad Pomelow, a minor,
through Randie Pomelow Jeske,
as guardian ad litem
for Chad Pomelow,
*Appellants.*

(96C-12960; CA A98292)

971 P2d 422

Gig Wyatt argued the cause and filed the briefs for appellants.

L. E. Ashcroft argued the cause for respondent. With him on the brief was Ashcroft & Rinehart.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

The issue in this case is whether a 16-year-old, unemancipated son who no longer lived at home with his mother is entitled to coverage under her homeowner's insurance policy. Plaintiff, Farmers Insurance Company of Oregon (Farmers), sought a declaratory judgment that the son was not a permanent resident of his mother's household and, consequently, was not an insured under the policy. The trial court, sitting as the trier of fact, held in favor of Farmers and denied the son liability coverage for a gunshot wound that he accidentally inflicted on a coparticipant in illegal drug activity. In so holding, the court rejected defendants' argument that the son, because of his status as an unemancipated minor, must be deemed a resident of the household as a matter of law. Defendants appeal, and we affirm.[1]

The son is the biological child of the named insured, the mother. With the exception of a summer long visit with his father in Maine, the son lived with his mother continuously until October 1994, shortly after his 16th birthday. He moved out following a disagreement, which arose because his mother was concerned about the character of some of his friends who, she announced, were no longer welcome in her house. In response, the son declared that he did not intend to live in her house any longer. After leaving home, the son stayed for the first few weeks at a friend's house, and then moved into an apartment with Dan Robinson. The son did not pay Robinson money for rent, nor did he pay for his share of the utilities. Instead, Robinson, who made money selling drugs, let the son contribute his share of the rent by assisting Robinson in drug transactions. With the exception of possessions he apparently no longer wanted (*e.g.*, clothes he no longer wore), the son moved his clothing and personal

---

[1] Plaintiff alternatively argued that, as a matter of public policy, coverage should not be extended to injuries that the son accidentally inflicted on a coparticipant in illegal drug activity. The trial court agreed and determined, as a second ground for its ruling, that it would be contrary to public policy "to require coverage when the shooting occurred during the distribution and use of methamphetamine and the person shot was engaged in this activity as well." Defendants also assign error to the trial court's alternative rationale for its decision. Because we find it dispositive, however, we reach only the question of whether the trial court could find on these facts that the son was not a resident of his mother's household.

hygiene products to Robinson's apartment and considered that his "home" for the indefinite future.

The son remained welcome in his mother's house and had access to it by the use of a key she kept hidden near the front door. He visited his mother often and, on a few occasions, even spent the night in his own room, which his mother left undisturbed. His mother neither reported him to law enforcement authorities as a "runaway" nor otherwise sought to force his return home; she decided, instead, that he should return on his own, if he were to return at all. She hoped he would come home, but he told her he did not intend to, and she believed him. The only action she took was to cancel his driver's license because she did not want him driving while still insured under her automobile policy.[2]

The son was living at Robinson's apartment on November 26, 1994, when the injury occurred that gave rise to this insurance dispute. That morning, he and Robinson went to another person's house to sell drugs. The son took a gun with him "for protection." After a couple of hours, the son and Robinson ended up in a bathroom with Hayley Crawford, James Benson, and others. The people in the bathroom were examining and handling Robinson's firearm. The son removed a .22 caliber pistol from his jacket pocket and pulled the slide back. Benson asked to see it and grabbed it, at which point the pistol accidentally discharged. The bullet struck Crawford in the leg.

Crawford sued the son and his mother. The mother tendered the defense to Farmers, claiming that her homeowner's insurance policy covered the claim. Under the policy's terms, liability coverage extends to those persons who are "insureds." The policy defines "insured" to include the named insured (here, the mother) and any "permanent resident" of the insured's household who is either a relative or a person under 21 years old. The son's status as an insured thus depends on whether he was a "permanent resident" of the mother's household at the relevant time. Farmers

---

[2] ORS 809.320 permits a parent or guardian who has signed a minor's application for driving privileges to cancel those privileges if the driver remains under 18 years of age.

brought this declaratory judgment action to resolve that issue.

■ ■   Insurance policies extending coverage to persons based on their status as permanent residents of the insured household are commonplace and have been the subject of frequent litigation in Oregon. Consistently and for many years, the case law has considered a person's status as a resident of a household to be a question of fact. *Waller v. Rocky Mtn. Fire & Casualty*, 272 Or 69, 71-72, 535 P2d 530 (1975); *Oregon Mutual Ins. Co. v. Clemens*, 124 Or App 155, 158, 861 P2d 372 (1993); *Jordan v. Farmers Ins. Co.*, 123 Or App 109, 111, 858 P2d 919 (1993); *Federated Amer. Ins. v. Childers*, 45 Or App 379, 382, 608 P2d 584, *rev den* 289 Or 275 (1980). On appeal, a trial court's findings are binding unless no evidence supports them. *Farmers Insurance Company v. Stout*, 82 Or App 589, 592, 728 P2d 937 (1986), *rev den* 302 Or 657 (1987). A person's qualification as a household resident is resolved as one of law only if "the evidence does not disclose a factual situation from which it can be said that differing inferences could be drawn." *Garrow v. Pennsylvania Gen. Ins. Co.*, 288 Or 215, 220, 603 P2d 1175 (1979).

The cases have identified several factors relevant to whether a person is a resident of an insured's household. Collectively, those factors all point in a common direction—whether the insured and others in the household *intend* for the insured's house to be their place of permanent residency and reasonably act on that intent. For example, relevant circumstances include whether the persons alleged to be residents of the same household live under one roof, the length of time they have lived there, whether the residence is intended to be permanent or temporary, and whether they are financially dependent on one another. *Stout*, 82 Or App at 592. In cases involving the residency of a child who is away from home and in the military or attending a college, we have also considered whether the child: lived at home before military service or attending school; returns home on leaves and vacation; leaves significant personal items at home; uses the home address as a permanent address; continues to be supported financially by his or her parents; has taken actions to establish permanent residence elsewhere; and expresses an

intent to return to the parent's home. *Jordan*, 123 Or App at 112; *Childers*, 45 Or App at 384-85.

■ Here, to be sure, competing conclusions could be drawn from the record before us. The son had left home only a few months earlier. Given the circumstances of his leaving, his disagreement with his mother arguably might be expected to pass and his "moving out" could be viewed as temporary or otherwise transitory. On the other hand, a fact-finder equally could infer that the son had made a conscious and deliberate decision to live elsewhere, with no expectation, on his or his mother's part, that he would return. In particular, the record establishes that the son declared that he did not intend to return to his mother's household. Consistent with that declaration, he moved his personal belongings out of his mother's home and into an apartment that he considered "home" for the indefinite future. Although his mother hoped that he would change his mind, she accepted his decision. She did not take steps to force him to return, such as reporting him as a runaway, and she had his driver's license canceled, implicitly acknowledging that she no longer intended to control or take responsibility for his actions. The son's lifestyle, which centered on illegal drug activity and persons involved in drugs, was consistent with his intent not to return home, because his mother would not tolerate those activities or those associations. Finally, both mother and son believed he had moved out permanently. At most, the mother hoped the son would change his mind. That evidence readily supports a conclusion that the son no longer intended his mother's house to be his place of residence, and it thus supports the trial court's determination that the son was not an insured under the policy.

■ Defendants, however, argue that the issue should be approached differently where, as here, the question concerns an unemancipated minor. They cite *Lorenz v. Royer et ux.*, 194 Or 355, 241 P2d 142, 242 P2d 200 (1952), *overruled on other grounds by Hawkins v. Hawkins*, 264 Or 221, 504 P2d 709 (1972), for the proposition that a minor is incapable of changing his residence and is by law a permanent resident of

the custodial parent's household. *Lorenz* involved the question of a minor child's *legal domicile* for purposes of determining state jurisdiction over the child to resolve a custody dispute between the parents. Legal domicile for jurisdictional purposes does not equate—at least not necessarily—with actual residency.[3] By its terms, the contract of insurance at issue focuses on the latter, not the former. The policy covers, in addition to the named insured, persons who are related to the named insured and persons under 21 years old if, and only if, either of those classes of individuals are "permanent residents" of the household. Defendants' argument would require us to rewrite the policy to cover any unemancipated person under 21 years old who is in the named insured's legal custody, whether or not that person actually resides in the household. We decline to do so, because those are not the terms in which the policy is written.

█ Our conclusion, however, is not that a child's status as an unemancipated minor in a named insured's legal custody is irrelevant. We hold only that it is not controlling. In that regard, we agree with the Arizona Supreme Court's holding in *Farmers Ins. Co. of Arizona v. Oliver*, 154 Ariz 174, 741 P2d 307 (1987). Defendants rely on that case to argue that a child's legal domicile should be the test of where the child resides. To the contrary, the Arizona court rejected that proposition, concluding instead that the custodial parent's residency was to be considered *along with other relevant factors*:

> "[I]n our view the residency of a custodial parent, while a factor to be considered by the trier of fact in deciding a minor's residency under the terms of this policy, is not absolutely controlling. We find that one's *actual* residency and not *legal* residency is what is contemplated by the term 'resident' in this insurance policy exclusion, and therefore reject an absolute finding of a child's residency based solely on the residency of the custodial parent."

---

[3] Significantly, the Supreme Court later overruled *Lorenz* insofar as it held that legal domicile was the exclusive test for jurisdiction. *Hawkins v. Hawkins*, 264 Or 221, 236-37, 504 P2d 709 (1972). The court did so, in part, because "in applying technical rules of domicile, courts often find a domicile that is far removed both logically and factually from the child's actual abode[.]" *Id.* at 228. The artificial nature of the inquiry makes use of a "legal domicile" test all the harder to defend for insurance coverage negotiated in terms that speak to actual residency.

*Id.* at 179, 741 P2d at 312 (emphasis in original).

We reach the same conclusion. A child's age and unemancipated status logically bear on what both the child and the custodial parent intend, in terms of where the child permanently resides. But they are not controlling. In this particular case, we have no difficultly concluding that the 16-year-old son's status as a "permanent resident" of his mother's household properly requires a fact-based analysis, using the factors considered in *Stout, Jordan,* and *Childers,* and taking into account the son's age, maturity, and level of self-reliance.[4] Below, the son's minority and unemancipated status were argued to and considered by the trial court, along with the other relevant facts. From the circumstances as a whole, the trial court factually found that the son was not a permanent resident of his mother's household at the time in question. The record amply supports that finding.

Affirmed.

---

[4] We leave for another day, and another case if one arises, what inferences might or might not be appropriate if the circumstances involved a much younger child. The son here was 16 years old at the time in question. Our community deems minors of that age, unemancipated or not, to be sufficiently mature and responsible to, among other activities: drive an automobile on their own, ORS 807.060; possess a rifle, shotgun, or pistol, ORS 23.200; contract for a dwelling unit and utilities without a parent's consent, ORS 109.697; work 10 hours or more a day, and six days or more a week, ORS 653.315(1); and be prosecuted and sentenced as an adult for certain criminal offenses, ORS 137.705(2)(a).