26                February 22, 2024                No. 109

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

CONTINENTAL CASUALTY COMPANY
and Transportation Insurance Company,
*Plaintiffs-Counterclaim Defendants,*
*Respondents,*

*v.*

ARGONAUT INSURANCE COMPANY,
*Defendant,*

*and*

INSURANCE COMPANY OF NORTH AMERICA,
now known as Century Indemnity Company,
successor to CCI Insurance Company,
*Defendant-Counterclaimant-Cross Claimant,*
*Respondent,*

*and*

EMPLOYERS INSURANCE COMPANY OF WAUSAU,
*Defendant-Counterclaimant-Cross Claimant,*
*Respondent Cross-Appellant,*

*and*

INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,
*Defendant-Cross Claim Defendant,*
*Appellant Cross-Respondent.*

Multnomah County Circuit Court
16CV14319; A176743

David F. Rees, Judge.

Argued and submitted October 10, 2023.

William C. Perdue, Washington D. C., argued the cause for appellant-cross-respondent. Also on the briefs were Robert Reeves Anderson, Colorado, Samuel I. Ferenc, and Arnold & Porter Kaye Scholer LLP, Washington, D. C. and Thomas W. Brown, Julie A. Smith, and Cosgrave Vergeer Kestler LLP and Stephen R. Wong, Kenneth H. Sumner, and Sinnott, Puebla, Campagne & Curet APLC, California.

Laurie J. Hepler, California, argued the cause for respondents Continental Casualty Company and Transportation Insurance Company. Also on the brief were Rachel A. Beyda and Greines Martin Stein & Richland LLP, California, and Lawrence Gottlieb, Jeremy Schultze, H. Matthew Munson, and Betts, Patterson & Mines, P.S., Washington.

David C. Linder, Minnesota, argued the cause for respondent-cross-appellant Employers Insurance Company of Wausau. Also on the brief were Larson King LLP, Minnesota, and Thomas W. Sondag, Carter M. Mann, and Lane Powell, PC.

Thomas M. Christ and Sussman Shank LLP filed the brief for respondent Insurance Company of North America.

Before Egan, Presiding Judge, and Kamins, Judge, and DeVore, Senior Judge.

EGAN, P. J.

Reversed and remanded.

**EGAN, P. J.**

In *Continental Casualty Company v. Argonaut Insurance Company (A176763) (Wausau)*, 331 Or App 38, ___ P3d ___ (2024), we set out the background facts and legal context for this claim by plaintiff Continental Casualty Company and Transportation Insurance Company (collectively, Continental) for contribution from defendant/appellant Insurance Company of the State of Pennsylvania (ICSOP) and other insurers, for costs that Continental has incurred and is obligated to pay to Schnitzer Steel Industries, Inc. (SSI), and MMGL Corp (formerly Schnitzer Investment Corp) (SIC) (collectively "Insureds"), relating to the defense of claims by the United States Environmental Protection Agency (EPA) for environmental cleanup of the Portland Harbor Superfund Site. In that opinion, we reversed that portion of the trial court's judgment holding that defendant Employers Insurance Company of Wausau (Wausau), which had issued comprehensive general liability insurance to the Insureds, was subject to Continental's contribution claim. ICSOP issued three "umbrella" policies to the Insureds during the relevant period.[1] In this separate appeal by ICSOP from that same judgment, ICSOP challenges the trial court's determination on ICSOP's and Continental's cross-motions for summary judgment that, based on its umbrella policies, ICSOP is subject to Continental's claim for contribution to defense costs. Continental contends in a cross-assignment of error that, in the event that we determine that ICSOP is not subject to contribution, the judgment should be remanded for reallocation of contribution.[2]

On ICSOP's appeal, we conclude that the trial court erred. We therefore reverse that portion of the judgment holding that ICSOP is subject to Continental's contribution claim and remand the judgment for a reallocation of contribution.

We set forth additional facts as necessary to address the legal issues raised on appeal. After the EPA designated the Insureds as parties potentially responsible for cleanup

---

[1] The policy form is entitled an "umbrella policy" but the policy itself appears to provide only excess coverage over underlying policies.

[2] Wausau filed but has abandoned a cross-appeal.

of the Portland Harbor Superfund Site, the Insureds filed claims for defense and indemnity with their comprehensive general liability insurers, including Continental. They also filed a claim with ICSOP, which had provided what was entitled "umbrella" insurance to the Insureds during the relevant period, with limits of $5,000,000. The ICSOP policies provided excess coverage for losses within the scope of coverage of the underlying insurance named in the policy.[3] ICSOP denied coverage or a duty to defend, contending that, based on the provisions of its policies with the Insureds, the Insureds' environmental claims were subject to the excess liability portions of the policies and those provisions had not been triggered.

A federal judgment determined that Continental had a duty to defend the Insureds in the Portland Harbor Superfund Site claims by the EPA. Continental brought this action for contribution against all other insurers that had provided insurance to the Insureds during the relevant period, including ICSOP, as permitted by the Oregon Environmental Cleanup Assistance Act (OECAA), ORS 465.475 to 465.485.

ICSOP argued that it should not be allocated any portion of contribution toward defense costs, because its

---

[3] In *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 466 n 6, 836 P2d 703 (1992), the Supreme Court described three "tiers" of insurance—primary, excess, and umbrella:

"Liability insurance policies frequently are arranged in tiers, with each level of policy designed to 'kick in' when the coverage provided by the lower level of insurance is exhausted. The general nomenclature surrounding this phenomenon labels an insured's basic insurance as the 'primary' insurance, the insured's next level of insurance (that covers risks involving amounts in excess of the primary insurance) as 'excess' insurance, and the insured's final level of insurance (that covers risks only after and to the extent that lower levels do not) as 'umbrella' insurance.'"

Although *Hoffman* described three "tiers" of insurance and described the disputed policy in that case as "umbrella insurance," in fact, the policy would, in the event of a loss covered by the policy, pay the excess of the amount of the loss over the "amount recoverable" under certain underlying insurance policies, 313 Or at 466. Thus, "umbrella insurance" as used in *Hoffman*, was synonymous with excess coverage, rather than true umbrella coverage (*i.e.*, coverage of losses not covered by underlying policy's insuring clauses). Here, although it is not the dispositive issue, it appears that, as in *Hoffman*, the "umbrella" coverage of ICSOP's policies is really just excess coverage. If the policies were true umbrella policies, we would expect an insuring clause or clause describing covered risks different from the risks of liability for personal injury or property damage included within the main policy form's insuring clause.

policies with respect to the Insureds' environmental claim had two features: (1) The policies provided excess, not primary, coverage of any liability that the Insureds might have for cleanup of the Portland Harbor Superfund Site, meaning that the policies were excess to the loss covered by the underlying insurance listed in the policies—in this case, El Dorado Insurance Company, which is defunct. (2) ICSOP contended that its policies required "horizontal exhaustion," meaning that, before ICSOP's coverage was triggered, there must be an exhaustion of *all* comprehensive general liability policies the Insureds held for the covered loss, not just the El Dorado policies. Because there had not been exhaustion of the Insureds' comprehensive general liability policies, ICSOP asserted that ICSOP's policies were not triggered, and that it had no liability and no duty to defend.

ICSOP cited provisions of its policies that it contends support its construction. The policies' coverage provision stated:

"The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

"(a)   Imposed upon the Assured by law, or

"(b)   Assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner or employee of the Named Assured, while acting in his capacity as such,

"for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:—

"(i)     Personal injuries, including death at any time resulting therefrom,

"(ii)    Property Damage,

"(iii)   Advertising liability,

"caused by or arising out of each occurrence happening anywhere in the world."

The policies' "Limit of Liability" provision stated:

"The Company shall only be liable for the ultimate net loss the excess of either

"(a)   the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or

"(b)   the amount as set out in the declarations as the self-insured retention in respect of each occurrence not covered by said underlying insurances (hereinafter called the "Underlying Limits")[.]

"* * * * *

"In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of losses paid there-under, this policy shall

"(1)   in the event of reduction pay the excess of the reduced underlying limit

"(2)   in the event of exhaustion continue in force as underlying insurance. The inclusion or addition hereunder of more than one Assured shall not operate to increase the Company's limit of liability."

As noted, the policies' coverage was for "ultimate net loss." The policies defined "ultimate net loss":

"The term 'Ultimate Net Loss' shall mean the total sum which the [Insured] or any company as his insurer or both become obligated to pay by reason of *** property damage ***, and shall also include expenses for *** lawyers *** and investigators and other persons and for litigation, adjustment and investigation of claims and suits which are covered hereunder[.]

"*[ICSOP] shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.*"

(Emphasis added.) Thus, ICSOP's coverage and liability to indemnify for expenses constituting "ultimate net loss,"—including the Insureds' defense costs—as defined in the first paragraph above, arose only if, as stated in the second paragraph, such incurred expenses were not included in other "valid and collectible" insurance.

ICSOP's policies also included a Loss Payable provision stating, in part:

"Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence."

The policies also included an "Other Insurance" provision:

"If other valid and collectible insurance with *any other insurer* is available to [the Insureds] covering a loss also covered by this policy *** the insurance afforded by this policy shall be excess of and shall not contribute with such other insurance."

(Emphasis added.) Those paragraphs, ICSOP contended, established ICSOP's excess coverage as requiring "horizontal exhaustion," meaning that, before ICSOP's excess coverage could be triggered, all insurance provided by all other insurers for the covered loss during the relevant time must have been exhausted. Because the Insureds had other insurance policies that were "valid and collectible" on their environmental claim during the relevant periods, ICSOP asserted that it had no liability for defense costs or any loss that had been incurred by the Insureds.

ICSOP's policies included a provision for "Maintenance of Underlying Insurances," requiring the Insureds to maintain underlying insurance during the policy terms. ICSOP's policies provided excess coverage for losses covered by the underlying insurance. The policies provided that the Insureds' failure to retain underlying insurance would not change ICSOP's liability, meaning that ICSOP's coverage remained excess of what the underlying policy should have provided:

"It is a condition of this policy that the policy or policies referred to in the attached 'Schedule of Underlying Insurances' shall be maintained in full effect during the currency of this policy except for a reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of accidents and or occurrences occurring during the period of this policy. *Failure of the [Insured] to comply with the foregoing shall not invalidate this policy but in the event of such failure, [ICSOP] shall only be liable to*

> the same extent as they would have been had the [Insured]
> complied with the said condition."

(Emphasis added.)

The policies included a provision entitled "Assistance and Cooperation," stating that ICSOP would have no duty to defend the Insureds (as distinct from coverage for indemnification of defense costs included within "ultimate net loss"):

> "[ICSOP] shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against [the Insureds]. But [ICSOP] shall have the right and shall be given the opportunity to associate with the [Insured] or the [Insured's] underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve [ICSOP], in which event the [Insured] and [ICSOP] shall co-operate in all things in the defense of such claim, suit or proceeding."

But the policies also included a "Defense Endorsement," which established a duty to defend in certain circumstances:

> "In consideration of the premium provided, it is understood and agreed that in the event there be no underlying insurance against loss or claim covered by [the ICSOP Policies] [ICSOP] agrees to defend in [the Insureds'] name and behalf any suit against [the Insureds] alleging *** property damage and seeking damages on account thereof ***.
>
> "All other terms and conditions remain unchanged[.]"

As Continental reads the defense endorsement, it triggered a duty to defend if the underlying insurance named in the policy—El Dorado—was not available to pay a claim. Thus, Continental asserted that, because El Dorado had become insolvent and was no longer in existence, it was not available, and ICSOP's defense endorsement was triggered.

ICSOP understands the defense endorsement differently—not, like Continental, as wholesale exception to the general policy provisions described above regarding excess coverage, but as a description of ICSOP's duty to defend if

the loss is one for which the ICSOP policy provides umbrella coverage, *i.e.*, coverage for losses not within the scope of coverage provided by underlying insurance. That is, in the event that a loss is not within the scope of coverage provided by an underlying insurance (*i.e.*, for which "there be no underlying insurance"), rendering ICSOP's umbrella coverage primary after payment of the Insureds' reserve, then ICSOP has an obligation to defend. However, ICSOP contended, as to the Insureds' environmental claims, which are within the scope of coverage of the El Dorado policies as well as within the scope of coverage of other valid and collectible insurance, its coverage, as well as its duty to defend, remained both excess and subject to the requirement for horizontal exhaustion—*i.e.*, would be triggered only in excess of the limits of the El Dorado policies *and* when all other insurance was exhausted, even if the underlying insurer, El Dorado, was no longer solvent or in existence.

As pertains to ICSOP, the trial court agreed with Continental's construction of the defense endorsement and held that, as a result of the extinction of El Dorado, there was an absence of underlying insurance, and ICSOP had a duty to defend the Insureds. The court therefore ruled that ICSOP was required to share in the apportionment of defense costs paid by Continental.

ICSOP challenges that ruling on appeal. In its first assignment, ICSOP contends that the trial court erred in determining on summary judgment that ICSOP's policies were triggered so as to give rise to a duty to share in apportionment of defense costs. In ICSOP's view, provisions of the policies—the "ultimate net loss," "other insurance," and "limitation of liability" provisions—unambiguously show that ICSOP's coverage for the claimed loss is excess to other valid and collectible insurance and also require that all other outstanding insurance be exhausted before ICSOP's policies becomes available, either for defense or indemnity. Because the Insureds had other valid and collectible insurance, ICSOP contends, its policies, including the defense endorsement, were not triggered and there was no duty to defend. As for the defense endorsement, ICSOP contends that because there was underlying insurance through El Dorado, despite

El Dorado's dissolution, the defense endorsement is not triggered. Alternatively, ICSOP contends that the phrase "in the event there be no underlying insurance" means simply that ICSOP will assume, under ICSOP's umbrella coverage, defense of a claim that is not within the scope of coverage of underlying insurance. But that umbrella coverage, ICSOP contends, is still subject to the policy's requirement for horizontal exhaustion. Thus, the obligation to defend would not be triggered by the endorsement unless all other valid and collectible insurance is exhausted.

Continental agrees with ICSOP that the defense endorsement's reference to "underlying insurance" is a reference to El Dorado. But in Continental's view, the defense endorsement is triggered if the underlying insurance is not *available to pay damages on this claim.* Here, Continental argues, and the trial court held, in view of El Dorado's dissolution, there is no underlying insurance to pay the Insureds' claim. Thus, Continental argues, "there be no underlying insurance," and the defense endorsement has been activated. Continental assert that, if and to the extent the defense endorsement conflicts with other provisions relating to excess coverage and horizonal exhaustion, the defense endorsement, as the provision relating specifically to the duty to defend, controls over those more general provisions and does not require exhaustion of other policies. *See Waller v. Auto-Owners Ins. Co.*, 174 Or App 471, 476, 26 P3d 845 (2001) ("To the extent that there is a conflict between the terms of an insurance policy and an endorsement, the endorsement controls.").

An insurer's duty to defend is determined by comparing the complaint to the insurance policy. *West Hills Development Co. v. Chartis Claims*, 360 Or 650, 653, 385 P3d 1053 (2016) (describing rule). Here, it is undisputed that the issue on appeal turns on a construction of the defense endorsement of the ICSOP policies, in the context of the policy as a whole, and whether it provides coverage for the Insureds' defense. Construction of an insurance policy requires ascertaining the parties' intent, which is determined from the terms and conditions of the policy. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307, 985 P2d

1284 (1999). The interpretation of plain and unambiguous policy provisions is a question of law for the court. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992).

We conclude that ICSOP's construction of the defense endorsement as triggered only when underlying insurance and other policy limits are exhausted is the correct construction, when viewed in the context of the policy as a whole, because it gives the endorsement a meaning that is consistent and not in conflict with the policies' other provisions. The defense endorsement must be considered in the context of the Assistance and Cooperation provision of the main policy, which explicitly denied a duty to defend and provided only a discretionary right to an opportunity to assist in the defense; the defense endorsement added a true duty to defend when the policy covered a risk, albeit "in the event there be no underlying insurance against loss or claim covered by [the ICSOP Policies]." As we understand the phrase "in the event there be no underlying insurance against loss or claim covered by [the ICSOP Policies]," it is a reference to coverage that ICSOP's policies provided when the *limits* of the underlying insurance had been exhausted. Thus, despite El Dorado's current insolvency, it was nonetheless underlying insurance, and its policy limits must be exhausted before ICSOP's duty to defend is triggered.

Additionally, as ICSOP argues, the defense endorsement states explicitly that "[a]ll other terms and conditions remain unchanged." Under the policies' Limits of Liability, Loss Payable, "Other Insurance," and "Ultimate Net Loss" provisions, ICSOP's indemnity coverage is not triggered if there are other policies that covered the loss and the limits of those polices have not been exhausted. The provisions of ICSOP's policies mean that ICSOP's liability and coverage are both excess to El Dorado's limits as stated in El Dorado's policies and excess to all other valid and collectible insurance covering the risk. The defense endorsement would be subject to both of those policy features.

Thus, we conclude that the defense endorsement, read in the context of the policy as a whole, means that, when the underlying insurance does not cover a claimed loss

because limits have been met, ICSOP will have a duty to defend, subject to exhaustion of the limits of other valid and collectible insurance. It is undisputed that El Dorado's scope of coverage included the Insureds' environmental claims; thus, although El Dorado is defunct, ICSOP's coverage of the Insureds' loss based on El Dorado's underlying coverage is still excess of El Dorado's coverage limits and not primary, and ICSOP's coverage will not be triggered until the limits of El Dorado's policies have been exhausted. *See Century Indemnity Co. v. Marine Group, LLC*, 131 F Supp 3d 1018 (D Or 2015) (reaching same conclusion under same defense endorsement in ICSOP policy). Additionally, even in that context, ICSOP's duty to defend under the defense endorsement is subject to the policies' requirement that, as long as there is valid and collectible insurance on the Insureds' environmental claim, ICSOP has no duty to defend.

We decline to read the defense endorsement in isolation from the rest of the policy so as to create coverage beyond what is consistent with the policy provisions as a whole. We conclude, therefore, that Continental was not entitled to seek contribution from ICSOP and that the trial court erred in so concluding. We therefore reverse and remand the judgment for a redetermination of the allocation on Continental's claim for contribution to defense costs.

Reversed and remanded.